# EXHIBIT A

#2'/01       Melbourne, FL - '07



## The Joint Franchise Co., LLC

## FRANCHISE AGREEMENT

# TABLE OF CONTENTS

1.  PREAMBLES AND GRANT OF FRANCHISE ...................................................... 1
    1.1.  Preambles. .................................................................................................. 1
    1.2.  Grant of Franchise, Initial Term, Successor Agreement and Successor Term. ..... 1
    1.3.  Exclusive Rights. ........................................................................................ 2
    1.4.  Reservation of Rights. ................................................................................. 3
2.  TRAINING AND GUIDANCE ............................................................................. 3
    2.1.  Training. ...................................................................................................... 3
    2.2.  Operating Manual and Software Package. ................................................. 3
    2.3.  Employees; Nondisclosure Agreements; Operating Manual ..................... 4
    2.4.  Conferences and Meetings .......................................................................... 4
3.  DEVELOPMENT AND COMMENCEMENT OF OPERATIONS ....................... 4
    3.1.  Development of the Franchise ..................................................................... 4
    3.2.  Acquisition (and Approval) of a Suitable Location .................................... 5
    3.3.  Approval of Lease and Required Lease Provisions ..................................... 5
    3.4.  Facility Construction/Improvements/Remodeling ....................................... 6
    3.5.  Relocation .................................................................................................... 6
    3.6.  Fixtures, Furnishings, Signs, and Other Equipment ................................... 6
    3.7.  Commencement of Operations .................................................................... 6
4.  MARKS .................................................................................................................... 7
    4.1.  Ownership and Goodwill of Marks. ............................................................ 7
    4.2.  Limitations on Your Use of Marks ............................................................. 7
    4.3.  Notification of Infringements and Claims .................................................. 7
5.  RELATIONSHIP OF THE PARTIES/INDEMNIFICATION ............................... 7
    5.1.  No Fiduciary Relationship .......................................................................... 7
    5.2.  Identification of Franchise Relationship .................................................... 7
    5.3.  Your Indemnity ........................................................................................... 8
6.  FEES AND REPORTS .......................................................................................... 8
    6.1.  Initial Franchise Fee ................................................................................... 8
    6.2.  Royalty Fee ................................................................................................. 8
    6.3.  Late Charge ................................................................................................ 8
    6.4.  . Pre-authorized Bank Form ....................................................................... 8

7.    CONDUCT OF THE BUSINESS AND OPERATING STANDARDS ............................. 9
      7.1.    Authorized Services ............................................................................................. 9
      7.2.    Evaluations; Monitoring of Facility. ................................................................. 10
      7.3.    Compliance with Laws and Good Business Practices. ..................................... 10
      7.4.    Insurance. .......................................................................................................... 11
8.    ADVERTISING PROMOTION AND SUPPORT ................................................... 11
      8.1.    By the Company. ............................................................................................... 11
      8.2.    Advertising By You ............................................................................................ 12
      8.3.    Internet Site Hosting ........................................................................................ 12
9.    RECORDS AND REPORTS ..................................................................................... 12
10.   AUDITS ..................................................................................................................... 12
      10.1.   Generally ............................................................................................................ 12
      10.2.   Understatement; Costs ..................................................................................... 13
11.   ASSIGNMENT/TRANSFER OR OTHER DISPOSITION OF THE BUSINESS ......... 13
      11.1.   By the Company ................................................................................................ 13
      11.2.   You May Not Assign Without Our Approval .................................................... 13
      11.3.   Assignment to Entity Principally Controlled by You ...................................... 13
      11.4.   Conditions for Approval of a Transfer ............................................................ 14
      11.5.   Your Death or Disability. ................................................................................. 15
      11.6.   The Company's Right of First Refusal ............................................................. 15
12.   TERMINATION OF THE FRANCHISE .................................................................. 16
      12.1.   By You ................................................................................................................ 16
      12.2.   Pre-Operational Termination .......................................................................... 16
      12.3.   Termination By Company Without Cure Period .............................................. 16
      12.4.   Additional Conditions of Termination ............................................................ 17
13.   RIGHTS AND OBLIGATIONS OF US AND YOU UPON TERMINATION, EXPIRATION
      OR TRANSFER OF THIS AGREEMENT ............................................................... 18
      13.1.   Payment of Amounts Owed to Us .................................................................... 18
      13.3.   Additional Obligations ...................................................................................... 18
      13.4.   Covenant Not to Compete. ............................................................................... 18
      13.5.   Continuing Obligations .................................................................................... 19
14.   ENFORCEMENT ...................................................................................................... 19

|  |  |  |  |
|---|---|---|---|
|  | 14.1. | Severability and Substitution of Valid Provisions. | 19 |
|  | 14.2. | You May Not Withhold Payments. | 20 |
|  | 14.3. | Arbitration. | 20 |
|  | 14.4. | Specific Performance/Injunctive Relief | 21 |
|  | 14.5. | Rights of Parties are Cumulative | 21 |
|  | 14.6. | Costs and Attorneys' Fees | 21 |
|  | 14.7. | Governing Law/Consent to Jurisdiction. | 21 |
|  | 14.8. | Binding Effect | 22 |
|  | 14.9. | Integration, Nature and Scope, Construction. | 22 |
|  | 14.10. | Limitation of Claims | 22 |
| 15. | NOTICE | | 23 |
|  | 15.1. | Notice | 23 |
| 16. | REPRESENTATIONS AND ACKNOWLEDGMENTS | | 23 |

## THE JOINT FRANCHISE AGREEMENT

THIS *THE JOINT* FRANCHISE AGREEMENT (this "Agreement") is made and entered into this 31st day of December , 20 01, by and between **The Joint Franchise Co., LLC,** an Arizona limited liability company (the "Company" or "we" or "us"), with principal offices at 2810 Paces Ferry Rd., Suite 108, Atlanta, Georgia 30339, and Daniel III Walker, DC PA ("you"), whose principal address is 735 Carnegie Hill Road, Melbourne FL 32940

### 1.   PREAMBLES AND GRANT OF FRANCHISE

#### 1.1.   Preambles.

(i)     We are the creator and owner of the operating systems, trade secrets, concept, style, confidential information, and format (collectively, the "Operating System"), and the logotypes, service marks, and trademarks now or hereafter involved in the operation of The Joint (*"The Joint"*) facilities using the style, trademark, service mark, and trade name "The Joint...a chiropractic place"® or "The Joint®" (collectively, the "Marks"), and the goodwill associated therewith, and have the right to grant to others the license to operate *The Joint* facilities using the Operating System and the Marks, subject to the continuing control by us of the method of operation of *The Joint* facilities and the quality of the services provided by *The Joint* facilities.  The operational aspects of the franchise are contained within the Operating Manual(s) (as defined below) loaned to you.

(ii)     We grant *The Joint* franchises to other individuals or entities that meet our qualifications and are willing to undertake the investment and effort to establish develop and operate a *The Joint* facility.  The franchise grants the right and obligation to own and operate a *The Joint* facility offering the services authorized and approved by us utilizing the Operating Systems and the Marks for a specified term.

(iii)     You have applied for a *The Joint* franchise to own and operate a *The Joint* business and, in reliance upon all of the representations made in your application as well as the representations made in this Agreement, we desire to grant you the right and license to own and operate a *The Joint* business Using the Operating System and Marks, subject to the terms and conditions contained in this Agreement.

#### 1.2.   Grant of Franchise, Initial Term, Successor Agreement and Successor Term.

(i)     Grant of License.  Subject to the terms and conditions of this Agreement, we hereby grant to you a nonexclusive license to operate a *The Joint* facility (the "Facility") using the Operating System and the marks at a location to be identified in Exhibit "A" attached to this Agreement and incorporated by reference (or upon your entering into a lease for your *The Joint* facility) (the "Location").  The establishment by you of additional *The Joint* facilities requires additional franchises from us and the payment to us of additional franchise fees.

(ii)     Initial Term.  The initial term of the franchise shall commence on the date that this Agreement is executed and shall expire ten (10) years thereafter (the "Initial Term").

(iii)    Successor Agreement.  Upon the expiration of the Initial Term, and provided that all of the conditions identified in this *Section* are satisfied, you will have the right to enter into up to four (4) consecutive successor *The Joint* franchise agreements (each, a "Successor Agreement").  Each Successor Agreement shall consist of a five (5) year term (the "Successor Term").  Each Successor Agreement shall be the current form of *The Joint* franchise agreement employed by us in the grant of franchises as of the date of the expiration of the Initial Term of this Agreement or the Successor Term of a Successor Agreement, as applicable.  The terms and conditions of a Successor Agreement, including fees and other obligations, may vary materially and substantially from the terms and conditions of this Agreement.  Each Successor Agreement shall (i) be modified to reflect the remaining number of Successor Terms permitted in accordance with this Agreement and (ii) in the event that the Successor Term in our Successor Agreement is not five (5) years, the Successor Term provided under the Successor Agreement shall be modified to reflect the five (5) year Successor Term permitted by this Agreement.  You will be permitted to enter into a Successor Agreement only if each of the following conditions are satisfied with respect to each such Successor Agreement:

(a)    You give us written notice of your intent to enter into a Successor Agreement (a "Notice") not less than three (3) months or more than six (6) months prior to the expiration of the Initial Term or the immediately preceding Successor Term, as applicable.

(b)    You are not in default under this Agreement or any other agreement with us either at the time you provide the Notice or at the time you execute the Successor Agreement.

(c)    You have executed the Successor Agreement as well as all ancillary documents that we require *The Joint* franchisees to execute in connection with the purchase of a *The Joint* business as of the date of the expiration of the Initial Term or Successor Term, as applicable.

(d)    Prior to the expiration of the Initial Term or Successor Term, as applicable, you and all of your owners shall execute our then current form of general release.

(e)    You pay us a renewal fee of $2,500...

### 1.3.    Exclusive Rights.

You will receive an exclusive territory of a 3-mile radius from any other franchise location, except as may be set out on Exhibit A, attached hereto.  You will operate from one location and must receive our permission before relocating.  You can accept patrons from outside your territory without specific payment to us or any other franchisee.

### 1.4.    Reservation of Rights.

We reserve all rights not expressly granted to you under this Agreement.  Without limiting the generality of the foregoing, we reserve the right to develop and operate and grant rights and licenses to others to develop and operate *the Joint* businesses outside of your exclusive territory, whether under the

Marks or under any other trademarks, service marks or trade names, and on any terms and conditions that we in our sole discretion deem appropriate.

2.    **TRAINING AND GUIDANCE**

    2.1.    **Training.**

        (i)    We shall provide an initial training program in the operation of the Facility during such period as we designate prior to the commencement of Facility operations.  The training program shall be furnished at our *The Joint* training facility located in our Atlanta headquarters or at such other facility as we may designate.  The duration of the basic training course shall be not less than three (3) days.

        (ii)    You shall be responsible for any travel and living expenses that you and a licensed chiropractor employee ("CE") incur in connection with such training and for any salary and other costs paid to or incurred by or on behalf of a CE in connection with such training. If you are a licensed chiropractor and will be supervising the franchised business on a full time basis, then you do not have to bring a second person to training.

        (iii)    We may require that previously trained and experienced *The Joint* facility owners and CE's periodically attend refresher and/or advanced training courses or annual conferences at our *The Joint* training facility located in our Atlanta headquarters or at another facility designated by our representative or us. At all times, the franchised business must be conducted by a CE who has successfully completed our initial training program.

    2.2.    **Operating Manual and Software Package.**

        (i)    We will lend to you, for the duration of this Agreement, our confidential Operating Manual (the "Operating Manual") and a customized *The Joint* software package ("*The Joint* Software"). The Operating Manual and *The Joint* Software will contain mandatory and suggested operating, accounting and reporting procedures, as well as quality standards for services and procedures prescribed from time to time by us for *The Joint* operations and you agree to comply with the mandatory items. All information in the Operating Manual and *The Joint* Software are confidential and proprietary and constitute our trade secrets. Information contained within the Operating Manual and/or *The Joint* Software shall not be disclosed to third parties without our prior written approval.

        (ii)    We have the right to add to and otherwise modify the Operating Manual and *The Joint* Software from time to time to reflect changes in authorized services, in standards of services, and in procedures and specifications. These modifications may or may not be a part of the Operating Manual and/or *The Joint* Software, but in all events shall be communicated to you in writing. Such additions or modifications shall constitute provisions of this Agreement as if fully set forth in this Agreement. You shall keep your copies of the Operating Manual and *The Joint* Software current. In the event of a dispute relative to the contents of the Operating Manual or *The Joint* Software, the master copies maintained by us at our principal office shall be controlling.

    2.3.    **Employees; Nondisclosure Agreements; Operating Manual.**  You shall hire, train, and supervise competent, courteous employees for the operation of the Facility and shall pay all wages,

3

commissions, fringe benefits, worker's compensation premiums and payroll taxes (and other withholdings required by law) due with respect to the employees. Such employees shall be employees of yours and not of ours. You shall ensure that a sufficient number of trained employees are available to meet the operational standards and requirements of the Facility at all times. You shall ensure that your employees comply with the provisions of, and shall follow the procedures as may be set forth in the Operating Manual or any informational materials applicable to employees as may be published by us, and amended or updated from time to time. You shall ensure that all of your CEs and employees, as well as your officers and directors, who may have or will have access to our trade secrets, and other confidential information execute and deliver promptly to us a noncompetition and nondisclosure agreement in the form as may be prescribed by us from time to time prior to having access to said trade secrets, and other confidential information. You shall use your best efforts to ensure the compliance of your CEs, employees, officers, and directors with the noncompetition and nondisclosure agreement and with the other requirements described in this Agreement pertaining to confidentiality. You shall immediately notify us of any breach of such noncompetition and nondisclosure agreement or of any other requirement described in this Agreement pertaining to confidentiality by any of your CEs, employees, officers, and directors or by any other person or party of which you are aware. In the event of any such breach, we shall have sole discretion in deciding what action, if any, should be taken and we shall retain continuing control over such action. If we undertake the enforcement of said agreements, you shall cooperate with our prosecution of the enforcement actions or proceedings. Because you have the direct relationship with your CEs, employees, officers, and directors in terms of their initial hiring, supervision, daily contact and retention, and similar factors relevant to the confidentiality issues and requirements described in this *Section 2*, and in consideration of our reliance on you with regard to these matters, you shall pay all of our reasonable expenses incurred in the prosecution of said enforcement actions or proceedings, whether or not suit is filed, including, without limitation, our reasonable attorneys' fees and court costs.

     2.4.   **Conferences and Meetings.**   You will be required to attend *The Joint* periodic conferences.

## 3.   DEVELOPMENT AND COMMENCEMENT OF OPERATIONS

     3.1.   **Development of the Franchise.**   You agree to do or cause to be done within six (6) months following execution of this Agreement, unless otherwise agreed to in writing by us, the following:

          (i)    Locate a suitable site, obtain our approval, and enter into a lease, all as outlined in *Subsections 3.2* and *3.3* of this *Section*;

          (ii)    Lease or purchase and install any improvements, equipment, signs or other items which we may require to effectively conduct business at the Facility and commence the active, full-time operation of the Facility, and purchase Facility supplies, computer hardware, software, office supplies, forms, or other operating items required to conduct business at the Facility, all as specified within the Operating Manual;

          (iii)   Obtain all necessary insurance as outlined in *Section 8.4* of this Agreement;

4

(iv)     Comply with all applicable state, county and local laws and ordinances pertaining to the start up of the Facility, including, but not limited to, all required business permits and licenses; and

(v)     Open the Facility and commence business continuously, as outlined in *Subsection 3.7* of this *Section.*

3.2.     **Acquisition (and Approval) of a Suitable Location.** You will have ninety (90) days following execution of this Agreement to locate a site for the Facility, unless otherwise agreed to in writing by us.

3.3.     **Approval of Lease and Required Lease Provisions.** If the Location shall be leased by you, you shall also provide to us, no less than ten (10) days prior to the execution of the lease, all pertinent details, including proforma copies of the lease and amount of square footage. You are required to obtain our written approval before entering into a lease of the franchise premises. Our written approval of your proposed site and lease does not constitute our guarantee of success of your business at the site you have selected, nor does it constitute a legal review. You shall ensure that any lease contains the following provisions:

(i)     Lessor shall agree that, if we cure your and/or lessee's defaults under the lease, then we may, at our option, succeed to your and/or lessee's interests under the lease and shall be recognized by landlord as the lessee or sublessee thereunder for the remaining term of the lease;

(ii)     Lessor shall agree that an expiration of this Agreement or a termination of this Agreement prior to expiration, in either case because of your and/or lessee's uncured or incurable events of default as set forth in *Section 12* of this Agreement, shall constitute a default under the lease, giving us the right but not the obligation to cure said default under the lease by succeeding to your and/or lessee's interests as the new lessee or sublessee under the lease as aforesaid;

(iii)     Lessor shall agree that, if the lease expires without renewal by you and/or lessee, or terminates prior to its expiration for any reason, we shall have the first right of refusal to lease the Location as the new lessee or sublessee; and

(iv)     Lessor shall agree that, if we succeed to your and/or lessee's interests under the lease for any reason, we shall have the right to further assign the lease or to sublease the Location to either an entity owned or controlled by us, or to a franchisee or licensee who meets our requirements to be a franchisee or licensee and lessor's requirements to be a lessee or sublessee;

3.4.     **Facility Construction/Improvements/Remodeling.** After you sign the lease, you will construct and equip the Facility to our specifications. You will make, at your sole expense, changes necessary to conform the Facility to our specifications, including, but not limited to, repairing items not in good condition or not functioning properly, and upgrading and remodeling the Facility, including leasehold improvements, furniture, fixtures, equipment and signs. Any additions, alterations, modifications, or remodeling of the Facility by you require our prior written consent in our reasonable discretion. In addition to any remodeling required by us upon the renewal of this Agreement described in *Section 1.2* of this Agreement and upon the assignment of this Agreement described in *Section 11* of this Agreement, you shall, upon written notice from us and at your sole cost and expense, remodel and

5

make all improvements and alterations in and to the Facility as reasonably determined by us from time to time to be necessary to reflect the then-current *The Joint* specifications, standards, format, image, and appearance.

     3.5.   **Relocation.**  You may relocate the Facility only with our prior written approval, and provided there is no business interruption.  If the lease expires and is not renewed or if the landlord terminates the lease, you will have one (1) year to relocate the Facility, provided you did not breach the lease.  You will pay all expenses and liabilities to terminate the lease and move if you relocate the Facility.  Your failure to relocate the Facility within the specified time period and any extensions thereof will be considered a default and subject to termination pursuant to *Section 12* of this Agreement.

     3.6.   **Fixtures, Furnishings, Signs, and Other Equipment.**  You agree to use, in the development and continuing operation of the Facility, such equipment, fixtures, maintenance and repair items, signs, and other equipment and operating supplies that we have approved as meeting our specifications and quality standards for design, appearance, function, performance and serviceability. We will maintain the sole list of designated suppliers.

     3.7.   **Commencement of Operations.**  You shall commence operation of your Facility on the date when our authorized representative, in his/her sole judgment, determines that you (and a licensed chiropractor to be employed by you if you are not a licensed chiropractor) have successfully completed training and are capable of providing services that meet our standards on a consistent continuing basis and your Facility is fully operational and validly licensed by the appropriate state and/or local regulatory agencies.  In any event, you must commence operation of your Facility within six (6) months after execution of this Agreement, unless otherwise agreed to by us in writing.

4.    **MARKS**

     4.1.   **Ownership and Goodwill of Marks.**  You acknowledge that we are the owner of the Marks, which Marks are licensed to you by this Agreement, and that your right to use these Marks is derived solely from this Agreement, and that your right is limited to a license granted by us to conduct your Facility business pursuant to and in compliance with this Agreement and all applicable standards, specifications and operating procedures prescribed by us from time to time.  Any unauthorized use of the Marks by you shall constitute an infringement of our rights in and to the Marks.

     4.2.   **Limitations on Your Use of Marks.**  You agree to use the Marks as the sole identification of the Facility, provided that you shall identify yourself as the independent owner of the Facility in the manner prescribed by us.  You shall not use any Mark as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed to you by this Agreement), or in any modified form, nor may you use any Mark in connection with the sale of any unauthorized service or in any other manner not expressly authorized in writing by us.  You agree to prominently display the Marks on or in connection with media advertising, promotional materials, posters and displays, receipts, stationery and forms designated by us, and in the manner prescribed by us

     4.3.   **Notification of Infringements and Claims.**  You shall immediately notify us of any apparent infringement of or challenge to your use of any Mark, or claim by any person of any rights in

any Mark.  We shall have sole discretion to take such action as we deem appropriate and the right to exclusively control any litigation, Patent and Trademark Office proceeding, or other proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark, and you agree to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of our counsel, be necessary or advisable to protect and maintain our interest in any such litigation, Patent and Trademark Office proceeding or other proceeding, or to otherwise protect and maintain our interest in the Marks.

5.    **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION**

     5.1.    **No Fiduciary Relationship.**  It is understood and agreed by the parties to this Agreement that this Agreement does not create a fiduciary relationship between them, that we and you shall be independent contractors, and that nothing in this Agreement is intended to make either party a general or special agent, legal representative, subsidiary, joint venture, partner, employee or servant of the other for any purpose.

     5.2.    **Identification of Franchise Relationship.**  You shall conspicuously identify yourself at your base of operations, and in all dealings with patrons, contractors, suppliers, public officials and others of the public or private sphere, as the owner of the Facility under a franchise of ours and shall place such other notices of independent ownership on such forms, stationery, advertising and other materials as we may require from time to time.

     5.3    **Your Indemnity.**  You agree to indemnify, defend and hold us harmless from and against any and all claims arising in any way out of the operation of your franchised business

6.    **FEES AND REPORTS**

     6.1.    **Initial Franchise Fee.**  You agree to pay to us an initial franchise fee in the amount of FIVE THOUSAND DOLLARS ($5,000.00) (the "Franchise Fee") which shall be payable in full to us upon execution of this Agreement.  The Franchise Fee shall be fully earned by us and non-refundable.

     6.2.    **Royalty Fee.**  During the initial term of this Agreement, you shall pay us a continuing royalty fee (the "Royalty Fee") equal to $699.00 per month.  The monthly remittance will be by bank draft from your bank account, pursuant to your instructions as contained in a pre-authorized Bank form substantially in the form set forth in *Exhibit "B"* to this Agreement.

     6.3.    **Late Charge/Interest.**

        If any installment of the Royalty Fee, Advertising Fund Fee, or any other sum due under this Agreement has not been received by us when due then, in addition to such sums, you also shall pay a late charge of One Hundred Dollars ($100) and will pay interest at a rate of eighteen percent (18%) of the past due amount, or the highest amount permitted by your State law, whichever is lower.

     6.4.    **Pre-authorized Bank Form.**  You will execute a Pre-Authorized Bank Form (a copy of which is attached as Exhibit *"B"* to this Agreement), permitting us to debit your account for payment of Royalty and Advertising Fund Fees, and debit your account as necessary for product, etc. purchases from us.

7. **CONDUCT OF THE BUSINESS AND OPERATING STANDARDS**

7.1. **Authorized Services.** You agree that you will not, without our prior written approval, offer any services or merchandise that are not authorized by us for *The Joint* facilities, nor shall the Facility be used for any purpose other than operations in compliance with this Agreement. You may offer goods and services not associated with chiropractic care, and not pay royalties or advertising fees on the sale of those goods or services, but, given that you are operating under our proprietary marks, you may not offer any other goods or services without our prior approval, which approval will not be unreasonably withheld or delayed.

(i) <u>Your Personal Involvement; Operating Partner.</u> If you are a business entity or consist of more than one (1) natural person, then you shall designate one (1) or more individual owner who will work at the Facility on a full time basis. (Individually or collectively, the "Operating Partner"). You shall obtain our written approval of the person or persons designated as the initial Operating Partner, as well as any proposed successor Operating Partners. The Operating Partner shall directly supervise and be responsible for the day-to-day management and proper operation of the Facility in all respects whatsoever, shall be a licensed chiropractor (unless you will be employing a licensed chiropractor because you are not a licensed chiropractor), and shall be present at the Facility at least twenty-four (24) hours per week. The Operating Partner and/or CE must be present at the Facility during all operating hours, including pre-opening setup and post-closing shutdown of the Facility. The Operating Partner (and a CE if you will be employing such) must successfully complete our initial training program. All CE's who have or will have access to our trade secrets and other confidential information shall execute the noncompetition and nondisclosure agreement prior to having access to said operational systems, trade secrets, and other confidential information. The appointment of the Operating Partner shall not relieve you from your obligations under this Agreement.

(ii) <u>Scope of Business.</u> We may from time to time, without obligation to do so, add or delete services; items, merchandise and goods, and you shall do the same upon notice from us unless our prior written consent to the contrary is obtained. The deletion or discontinuance of one or more services by us shall not constitute a termination of the franchise or this Agreement.

(iii) You shall adhere to all specifications as may be contained in the Operating Manual or as otherwise may be prescribed by us as to methods, requirements, specifications, and similar matters. Unless our prior written consent is obtained, you shall not change the merchandise, goods or services offered at the Facility, or the supplier of such items. We may, without obligation to do so, establish, and from time to time amend, a standard service format and appearance, and you shall adhere to the revised requirements.



(iv) <u>Hours of Operation.</u> You will establish specific hours of operation and submit same to us for our approval, which approval will not be unreasonably withheld.

(v) <u>Advertising and Promotions.</u> You may, at your own cost and expense, and are encouraged to, advertise in the various advertising media to increase business at the Facility provided: (a) a copy of the proposed advertisement or description of the proposed promotion is furnished to us and our prior written consent thereto is obtained; (b) the advertisement or promotion applies only to the Facility and, to the best of your ability to control circulation and exposure, is intended to circulate only

8

in the Territory unless our prior written consent to the contrary is obtained; and (c) the proposed advertisement or promotion is dignified and calculated to uphold the integrity of the Marks. Provided our prior written consent is obtained, you may, and are encouraged to, coordinate or consolidate your advertising or promotional effort with us or with other franchisees. No advertising or promotional materials or items shall be used, sold, distributed, or displayed without our prior written consent. We may, without obligation to do so, elect to furnish advertising or promotional materials or items from time to time. If so furnished by us, you shall promptly commence the use of such advertising or promotional items or materials at the time and in the manner prescribed by us and you agree to participate in all approved operational, promotional and marketing programs, including but not limited to, a bar-coded membership card program.

7.2.   **Evaluations; Monitoring of Facility.**

(i)   Evaluations and Analysis.  To ensure compliance with this Agreement and the proper operation of the Facility, we or our representatives may have the unrestricted right to enter and evaluate the Facility and the operation of your business. During the course of such evaluations, we and our representatives will use reasonable efforts to minimize our interference with the operation of the Facility, and you and your employees shall not interfere with our operations analyst or the conduct of the evaluation.

(ii)   Monitoring of Facility.  You agree to comply with all mandatory specifications, standards and operating procedures relating to the operation of a *The Joint* facility including, without limitation, the following:

(a)   Use and illumination of signs, posters, displays, standard formats and similar items;

(b)   Materials and supplies used in the operation of the Facility;

(c)   Identification of you as the independent owner of the Facility;

(d)   Display of advertising and promotional materials for your Facility;

(e)   Establishment of daily business hours as specified in this Agreement; and

 (f)   Use of the designated computer system and proprietary software with high speed internet connection described in *Section 8* of this Agreement.

7.3.   **Compliance with Laws and Good Business Practices.**

(i)   Compliance with Laws and Regulations of Licensing.  You shall secure and maintain in force all required chiropractic and other licenses, permits and certificates relating to the operation of the Facility and shall operate the Facility in full compliance with all applicable laws, ordinances and regulations, including, without limitation, all government regulations relating to occupational hazards and health, worker's compensation insurance, unemployment insurance, and withholding and payment of federal and state income taxes, social security taxes and sales taxes.

        (ii)     Notification of Claim or Action.  You shall notify us in writing within two (2) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation of the Facility or the financial condition of you or the Facility.

       7.4.   **Insurance.**

        (i)     Public Liability Insurance: Worker's Compensation; Employment Practices Liability Insurance; and Other Coverage.  You shall at all times during the term of the franchise maintain in force at your sole expense and under policies of insurance issued by carriers approved by us which meet our specifications set from time to time.

        (ii)     Certificate of Insurance; Coverage by Us.  You shall furnish to us annually a copy of the certificate of insurance or other evidence of the renewal or extension of each such insurance policy.  Your failure to provide insurance coverage as indicated will be considered a default and subject to termination pursuant to *Section 12* of this Agreement.

8.     **ADVERTISING PROMOTION AND SUPPORT**

       8.1.   **By the Company.**

        Recognizing the value of uniform advertising and promotion to the goodwill and public image of *The Joint*, we have established a relationship with an advertising/marketing agency and will work with them to develop marketing, advertising, sales promotion and promotional materials, public and consumer relations, publicity, and such other programs as we may deem necessary or appropriate, in our sole discretion.  We shall direct all programs with sole discretion over the creative concepts, materials, endorsements and media used therein, and the placement and allocation thereof.

        You understand and acknowledge that any advertising/marketing that we do is intended to maximize general public recognition and patronage of *The Joint* for the benefit of all *The Joint* facilities and that we will use our best efforts to apportion advertising to obtain the greatest benefit for all facilities.  We shall have complete control and discretion in relationship to the media placement, creative content and concepts utilized.  Further, we shall not be obligated to expend our own funds or resources for any national or regional advertising unless, in our sole discretion, we agree to do so.

       8.2.   **Advertising by You.**  Prior to their use, samples of all local advertising and promotional materials not prepared or previously approved by us shall be submitted to us for approval, which approval shall not be unreasonably withheld.  If you do not receive our written disapproval within fifteen (15) days from the date of receipt by us of such materials, we shall be deemed to have given the required approval.  You shall not use any advertising or promotions materials that we have disapproved.

        You will conduct a grand opening advertising campaign with the opening of your Facility, according to our specifications.

       8.3.   **Internet Site Hosting.**  You may not maintain a World Wide Web site, conduct e-commerce, or otherwise maintain a presence or advertise on the Internet or any other public computer

network in connection with the Facility without our prior written approval, which we may withhold for any reason or no reason. We may require all of our franchisees to allow us to host their web pages.

## 9.   RECORDS AND REPORTS

(i)   Required Records and Retention. During the Initial Term and Successor Term, if applicable, you agree, at your expense, to maintain at the franchise location and preserve for five (5) years from the date of their preparation, full, complete and accurate books, records and accounts, showing all revenues for the periods shown. You shall furnish us such information and supporting records as we from time to time require within seven (7) days of our request.

## 10.   AUDITS

10.1.   **Generally.** We shall have the right at any time during business hours, and without prior notice to you, to inspect and audit, or cause to be inspected and audited, the business records of the Facility and the books and records of any entity which holds the franchise. You agree that we may access your computer for said purposes. You shall fully cooperate with our representatives and independent accountants hired by us to conduct any such inspection or audit.

## 11.   ASSIGNMENT/TRANSFER OR OTHER DISPOSITION OF THE BUSINESS

11.1.   **By the Company.** This Agreement and the franchise is fully assignable by us and shall be for the benefit of any assignee(s) or other legal successor(s) to our interest in this Agreement, provided that we shall, subsequent to any such assignment, remain liable for the performance of our obligations under this Agreement up to the effective date of the assignment.

11.2.   **You May Not Assign Without Our Approval.** Except as hereinafter provided with respect to assignment to a corporation or other legal entity, neither the franchise nor the Facility (or any interest therein) nor any part or all of the ownership of your legal entity may be voluntarily, involuntarily, directly or indirectly assigned, sold, subdivided, subfranchised or otherwise transferred by you or the franchise owner(s) including, without limitation, by merger or consolidation, by issuance of additional securities representing an ownership interest in the franchise, or, in the event of your death or an owner of the franchise, by will, declaration of or transfer in trust or the laws of intestate succession, without our prior written approval, and any such assignment or transfer without such approval shall constitute a breach of this Agreement and convey no rights to or interests in the franchise or the Facility.

11.3.   **Assignment to Entity Principally Controlled by You.** The franchise and its assets and liabilities may be assigned to a newly-formed corporation or other legal entity that conducts no business other than the operation of the franchise and in which you and any of your principals own and control in the aggregate not less than sixty-seven percent (67%) of the equity and voting power of all outstanding capital stock or ownership interest, provided that the transferee: (i) complies with all provisions of this Agreement and is appropriately licensed and bonded, if required by law; and (ii) submits to us any all documentation that we may reasonably request to effectuate the transfer, including the approving and acknowledging execution of this Agreement. We will waive the Transfer Fee for any transfer pursuant

to this *Section 11*. In such cases, you will remain fully liable under this Agreement, as if such transfer had not taken place.

    11.4.   **Conditions for Approval of a Transfer.**  If you and your owner(s) are in full compliance with this Agreement, we shall not unreasonably withhold our approval of a sale, provided that the proposed buyer is, in our opinion, an individual of good moral character who has sufficient business experience, aptitude and financial resources to own and operate the Facility and otherwise meet our then applicable standards for franchisees, and further provided that the following conditions are met prior to, or concurrently with, the effective date of the sale:

        (i)    All your obligations incurred in connection with this Agreement have been discharged or assumed by the buyer; and

        (ii)    You shall have paid such Royalty Fees, and amounts owed for purchases by you from us which are then due and unpaid; and

        (iii)    The buyer shall have completed the training program required of new franchisees; and

        (iv)    The buyer shall have proven to us its financial viability to undertake and perform the requirements of this Agreement; and

        (v)    The lessor shall have consented to your assignment of the lease to the buyer, or the buyer shall have secured substitute premises for the Facility which are approved by us; and

        (vi)    The buyer and its owner shall have executed a new franchise agreement, which may have different terms than those set forth herein, and agreed to be bound by the form of franchise agreement and such ancillary agreements as are then customarily used by us in the grant of franchises for *The Joint* facilities; and

        (vii)    You or the buyer shall have paid a training and assignment fee to us in the amount of FIVE THOUSAND DOLLARS ($3,000.00) to defray expenses incurred by us in connection with the transfer, including, without limitation, legal and accounting fees, credit and other investigation charges and evaluation of buyer and the terms of the transfer; and

        (viii)    The buyer shall have replaced or refurbished fixtures, signs, equipment, furniture and furnishings, and otherwise modified the Facility's methods and operations in compliance with specifications and standards then applicable to new franchises for *The Joint* facilities; and

        (ix)    You and your owner(s) shall have executed a general release, in a form satisfactory to us, of any and all claims against us and our members, managers, officers, directors, employees and agents; and

        (x)    We shall have approved the material terms and conditions of such transfer, including, without limitation, that the price and terms of payment are not so burdensome as to adversely affect the future operations of the Facility by the buyer in compliance with our then standard franchise agreement and ancillary agreements; and

Uniform Franchise Offering Circular – 7.2007

12

(xi)    You and your owner(s) shall reaffirm a covenant not to compete in favor of us and the buyer, all as contained within *Section 13* of this Agreement; and

(xii)   We have not exercised our right of first refusal under *Section 11.6* of this Agreement.

11.5.   **Your Death or Disability.**

(i)     <u>Generally.</u> Upon the death or permanent disability of you or a principal owner of franchisee, the executor, administrator, conservator or other personal representative of such franchisee or principal owner shall assign your or the principal owner's interest in the franchise to a third party approved by us within a reasonable time. Such assignments (including, without limitation, transfers by bequest or inheritance) shall be subject to the same conditions as any other assignment hereunder and if the heirs or beneficiaries of any such person are unable to meet the conditions of *Section 11.4* above, such personal representative shall have a reasonable time, not to exceed six (6) months, plus extensions agreed to by us in writing which will not be unreasonably withheld, from the date of your or the principal owner's death or permanent disability, to dispose of your or such principal owner's interest, which disposition shall be subject to all the terms and conditions for assignments as contained in *Section 11.4* above and to our right of first refusal as contained in *Section 11.6* below. Failure to so dispose of the interest of you or such principal owner within said period of time shall constitute a breach of this Agreement.

11.6.   **The Company's Right of First Refusal.** If you or an owner(s) shall at any time determine to sell an interest in the Facility or any ownership in the franchise, you or the owner(s) shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser and shall submit an exact copy of such offer to us. We shall have the right, exercisable by written notice delivered to you or the owner(s) within ten (10) business days from the date of delivery of an exact copy of such offer to us, to purchase such interest in the Facility or such ownership interest in the franchise for the price and on the terms and conditions contained in such offer, provided that we may substitute cash for any form of payment proposed in such offer and shall not have less than thirty (30) days to prepare for closing. If we do not exercise our right of first refusal, we shall have ten (10) days within which to approve the assignee subject to the terms and conditions of *Section 11.4* above.

If we do not exercise our right of first refusal, you or an owner(s) may complete the sale to such purchaser pursuant to and on the terms of such offer, subject to our approval of the purchasers as provided in *Section 11.4* above, provided that if the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such offer to us, or there is a material change in the terms of the sale, we shall again have the right of first refusal specified in this *Section*. In the event that an assignment is not consummated, our rights herein shall survive any future requests by you.

12.    **TERMINATION OF THE FRANCHISE**

12.1.   **By You.** You may terminate this Agreement if you are in substantial compliance with this Agreement and we breach this Agreement and fail to cure such material breach within ninety (90) days after written notice thereof is delivered to us. In the event of termination by you, all post-

termination obligations of yours described in *Section 13* of this Agreement shall not be waived but shall be strictly adhered to by you.

12.2. **Pre-Operational Termination.**   We may, in our sole discretion, terminate this Agreement prior to your opening the Facility for any of the following, all of which constitute defaults of this Agreement:

(i)     Your failure to arrange for the purchase or lease of a suitable location for the Facility within ninety (90) days after execution of this Agreement unless otherwise agreed to in writing by us; or

(ii)    Your failure to commence operating the Facility within six (6) months after execution of this; or

(iii)   Your inability to satisfactorily complete the training program after two (2) attempts or other demonstration that you are unable to adequately manage and operate a *The Joint* facility.

12.3. **Termination by Company without Cure Period.**  Further, we shall have the right to terminate the franchise upon five (5) days written notice, without opportunity to cure, for the following reasons, all of which constitute defaults of this Agreement:

(i)     If your license is suspended or revoked by the chiropractic regulatory authority in your state, even if you still maintain appeal rights; or

(ii)    If you become insolvent by reason of your inability to pay your debts as they mature; or

(iii)   If you file a voluntary petition in bankruptcy or any pleading seeking any reorganization, liquidation, dissolution or composition or other settlement with creditors under any law, or are the subject of an involuntary bankruptcy (which may or may not be enforceable under the Bankruptcy Act of 1978); or

(iv)    If you abandon, surrender, transfer control of or fail to actively operate the Facility for a period of three (3) consecutive days, unless such failure to operate is due to fire, flood, earthquake or similar causes beyond your control (unless you are the sole professional and you have previously advised us that you are taking vacation time); or

(v)     If you fail to pay any Royalty Fees or amounts due for items and/or services purchased from us or other approved suppliers or vendors, after one (1) written warning during any 12 month period.

(vi)    If you are convicted of or plead no contest to a felony, a crime involving moral turpitude or any other crime or offense that is likely to adversely affect the reputation of the Operating System and the goodwill associated with the Marks; or

(vii)   If you operate the Facility or any phase of your business in a manner that presents a health or safety hazard to your patrons, employees or the public; or

(viii)   If you have made a material misrepresentation to us before or after being granted the franchise, including underreports of any fees or royalties due us; or

(ix)   If you or we agree in writing to terminate the franchise; or

(x)   If you make an unauthorized assignment of the franchise or an ownership interest in the franchisee (if the franchisee is a corporation or partnership or limited liability company), the franchise or the Facility; or

(xi)   If you misuse or make an unauthorized use of any Mark or commit any act which can be reasonably expected to materially impair the goodwill associated with any Mark; or

(xii)   If you make any unauthorized use or disclosure of a trade secret of ours; or

(xiii)   If you fail to comply with any federal, state or local law or regulation applicable to the operation of the franchise; or

(xiv)   The Facility or business premises of the franchise are seized, taken over or foreclosed by a government official in the exercise of his or her duties, or seized, taken over or foreclosed by a creditor, lienholder or lessor, provided that a final judgment against you remains unsatisfied for thirty (30) days (unless a supersedes or other appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in the Facility, and it is not discharged within five (5) days of such levy.

12.4.   **Additional Conditions of Termination.**  Further, we shall have the right to terminate the franchise upon thirty (30) days written notice if defaults remain uncured in our sole discretion for the following reasons:

(i)   If you fail or refuse to submit financial statements, reports or other operating data, information or supporting records when due; or

(ii)   If you fail to assign the franchise or an interest in the franchise of a deceased or disabled principal owner thereof; or

(iii)   If you fail to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by us; or

(iv)   If you fail to relocate or commit a default under the lease or purchase contract for the Facility and any equipment utilized in the operation thereof; or

(v)   If you fail to provide or maintain required insurance coverage.

15

13.    **RIGHTS AND OBLIGATIONS OF US AND YOU UPON TERMINATION, EXPIRATION OR TRANSFER OF THIS AGREEMENT**

13.1.   **Payment of Amounts Owed to Us.**  You agree to pay to us within fifteen (15) days after the effective date of termination, expiration or transfer of this Agreement, or such later date that the amounts due to us are determined, such Royalty Fees, amounts owed for services and/or items purchased by you from us, interest due us on any of the foregoing and all other amounts owed to us which are then unpaid.  In the event of a unilateral termination by you, any lease liability of yours will survive termination.

13.2.   **Additional Obligations upon Termination, Expiration or Transfer of this Agreement.**  You agree that after the termination, expiration or transfer of this Agreement you will:

(i)    Not directly or indirectly at any time or in any manner identify yourself or your business as a current or former *The Joint* facility, or as a franchisee, licensee or dealer of or as otherwise associated with us, or use any Mark, any colorable imitation thereof or other insignia of a *The Joint* facility in any manner or for any purpose, or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with us;

(ii)    Return to us all signs, sign faces, catalogs, copies of patron lists, advertising and promotion materials, forms, and other materials containing a Mark or other identification relating to a *The Joint* facility;

(iii)    Take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any Mark;

(iv)    Notify the telephone company and all listing agencies of the termination or expiration of your right to use the existing Facility telephone number(s) and any regular, classified or other telephone directory listings associated with any *The Joint* or related Mark, and to authorize transfer of same to us or at our direction.  You acknowledge that as between us and you, we have the sole right to the interest in all telephone numbers and directory listings associated with any Mark and you authorize us, and hereby appoint us and any officer we designate as your attorney-in-fact, to direct the telephone company and all listing agencies to transfer same to us or at our direction, should you fail or refuse to do so, and the telephone company and all listing agencies may accept such direction or this Agreement as conclusive of our exclusive rights in such telephone numbers and directory listings and our authority to direct their transfer; and

(v)    Furnish to us within thirty (30) days after the effective date of termination, expiration or transfer of this Agreement evidence satisfactory to us of your compliance with the foregoing obligations.

13.3.   **Covenant Not to Compete.**

(i)    <u>Terms of Non-Compete.</u>  You and the principals of the franchise agree that during the Initial Term and Successor Term, if applicable, you and they shall not directly or indirectly have any interest as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative or agent, in any business competitive with the services then offered by us, nor shall you or

they divulge or otherwise disclose any of our confidential information or other trade secrets owned by us to anyone not associated with the franchise, including family members.  Upon expiration, termination or transfer of this Agreement for any reason, you and the principals of the franchise shall not have any interest as an owner, partner, director, officer, management level employee, consultant, representative or agent in any business competitive with the services then offered by us for a period of two (2) years following the occurrence of said event(s), within a three (3) mile radius of your Facility.

(ii)    Equitable Relief.  We shall still have an independent right to apply for equitable relief, including an injunction, regardless of the enforceability of any other section within this Agreement.  We shall not be required to arbitrate this or any equitable claim against you arising out of this covenant.

(iii)    Severability.  Further, the parties agree that each section of this Agreement, including subsections, is severable.  In the event that any section or subsection hereof is unenforceable, it shall not affect the enforceability of any other section or subsection and each party hereto stipulates and agrees that the Court may impose terms that it deems in its discretion shall make the covenant reasonable in terms of its scope, duration and geographical restraint.

(iv)    Attorneys' Fees.  In addition, you agree to pay our reasonable attorneys' fees and all other reasonable costs incurred by us in the prosecution of any action between the parties to enforce the covenants in this *Section*, provided we prevail in said action.

13.4.  **Continuing Obligations.**  All of your obligations that expressly or by their nature survive the expiration, termination or transfer of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration, termination or transfer and until they are satisfied in full or by their nature expire.

14.    **ENFORCEMENT**

14.1.  **Severability and Substitution of Valid Provisions.**

(i)    If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of this Agreement or refusal to enter into a Successor Agreement than is required by this Agreement, or the taking of some other action not required by this Agreement, or if under any applicable and binding law or rule of any jurisdiction or any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions of this Agreement

14.2.  **You May Not Withhold Payments.**  You agree that you will not, on grounds of the alleged non-performance by us of any of our obligations in this Agreement, withhold payment of any Royalty Fees, and amounts due to us for items and/or services purchased by you or any other amounts due us.

17

14.3.   **Arbitration.**   Before any arbitration takes place, the parties agree to submit the controversy or claim to non-binding mediation before a mutually agreeable mediator. Thereafter, the parties agree to submit any claim or dispute, disagreement, or matter pertaining to interpretation of this Agreement (the "Dispute"), or issues relating to the offer and sale of the franchise, except as otherwise specified in *Sections 4.1, 4.2, and 13.3* above, and except for any issues pertaining to your lease for the premises of your Facility, to binding arbitration before the American Arbitration Association ("AAA") in Atlanta, Georgia. The hearing shall be conducted pursuant to the Commercial Arbitration Rules of the AAA, and under the Expedited Procedures of such rules or under the Optional Rules for Emergency Measures of Protection of the AAA, if they may apply to the Dispute. Unless prohibited by applicable law, any Dispute must be brought by filing a written demand for arbitration within two (2) years following the conduct, act or other event or occurrence first giving rise to the claim; otherwise, the right to any remedy shall be deemed forever waived and lost.

Any Dispute and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. Any such arbitration proceeding will not be consolidated with any other arbitration proceeding involving any other person, except for disputes involving affiliates of the parties to such arbitration. The parties agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 23 of the Federal Rules of Civil Procedure) within the same proceeding as the Dispute to which it relates. Any such Dispute which is not submitted or filed in such proceeding will be barred. Any mediation settlement or arbitration award will have a binding effect only on the actual Dispute mediated or arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, mediation, or other dispute resolution proceeding.

There shall be a panel of three neutral arbitrators chosen from a list maintained by the AAA. Those individuals shall be experienced in the operation of franchise systems either as attorneys, accountants or businesspersons. The arbitrators shall render a binding and legally enforceable award that may be confirmed by a court of competent jurisdiction upon application of the prevailing party. The party filing the arbitration shall initially bear the cost of any arbitration fees or costs. However, the arbitrators shall in their discretion have the authority to award to the prevailing party all costs of the proceeding, including the arbitrators' costs, out-of-pocket disbursements and reasonable attorneys' fees. The arbitrator will not have the authority to award exemplary or punitive damages.

Should the parties so choose, they may waive in writing the requirement of arbitrating before a three-person panel and stipulate to binding arbitration before a sole arbitrator under the provisions stated in this *Section.*

Notwithstanding the foregoing, the infringement of the Mark or copyrighted items, unauthorized disclosure of Know-how or trade secrets, or violations of covenants not to compete may cause irreparable harm to us, other franchisees, and the franchise system as a whole. Accordingly, claims by either party to this Agreement related to these acts shall not be subject to the mediation or arbitration procedure, including but not limited to, claims for liquidated or punitive damages arising from any such infringement, unauthorized disclosure, or violation of a noncompetition or nondisclosure covenant.

If a court of competent jurisdiction decides the requirement to arbitrate a Dispute is unenforceable because applicable law does not permit the type of claim involved to be resolved by

arbitration, or because this Agreement limits a party's rights or remedies in a manner applicable law does not permit, or for any other reasons, then the arbitration clause shall not be void. Only those portions of the arbitration clause with respect to such claim or claims as are necessary to comply with applicable law will be invalid and considered severable, but the remainder will be enforced.

Our waiver of any of your defaults will not constitute a waiver of any other default and will not prevent us from requiring you to strictly comply with this Agreement.

14.4.   **Specific Performance/Injunctive Relief.**  Nothing contained in this Agreement shall bar our right to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will cause us loss or damage, under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions.  You agree that we may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, shall be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby).

14.5.   **Rights of Parties are Cumulative.**  The rights of us and you under this Agreement are cumulative and no exercise or enforcement by either party of any right or remedy under this Agreement shall preclude the exercise or enforcement by us or you of any other right or remedy under this Agreement or which we or you are entitled by law to enforce.

14.6.   **Costs and Attorneys' Fees.**  If we or you are required to enforce this Agreement in a judicial proceeding, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses, including reasonable accounting and legal fees as assessed by the court.

14.7.   **Governing Law/Consent to Jurisdiction.**

(i)     Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051, et seq.), or the franchising laws of any state may be applicable and as contained in Exhibit "C" to this Agreement, this Agreement and the franchise shall be governed by the laws of the State of Georgia.

(ii)    Either party may institute any action against the other arising out of or relating to a violation of the provisions of *Sections 4.1, 4.2,* and *13.3* of this Agreement in any state or federal court of general jurisdiction in the State of Georgia and you irrevocably submit to the jurisdiction of such court and waive any objection you may have to either the jurisdiction or venue of such court.

14.8.   **Binding Effect.**  This Agreement is binding upon the parties to this Agreement and their respective executors, administrators, heirs, assigns and successors in interest.

14.9.   **Integration, Nature and Scope, Construction.**

(i)     THIS    AGREEMENT    CONSTITUTES    THE    ENTIRE    AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES.  The exhibit(s) are part of this Agreement, which constitutes the entire understanding and agreement of the parties, and there are no other oral or written

19

understandings or agreements between us and you relating to the subject matter of this Agreement. Any representations not specifically contained in this Agreement made prior to entering into this Agreement do not survive subsequent to the execution of this Agreement. We and you have entered into this Agreement for the sole purpose of authorizing you to use the intellectual property rights licensed by this Agreement in the operation of a single business operation at the designated location during the term of this Agreement in which those specific items designated by us for sale in such locations are offered for sale in individual, face-to-face transactions with patrons visiting this fixed location (and equivalent telephone or mail transactions accepted as a convenience to that patron group). All consideration being furnished by you to us during the course of performance of this Agreement has been determined based on the limited rights and other limitations expressed herein. No other rights have been bargained for or paid for. This provision is intended to define the nature and extent of the parties' mutual contractual intent, there being no mutual intent to enter into contract relations, whether by agreement or by implication, other than as set forth above. The parties further acknowledge that these limitations are intended to achieve the highest possible degree of certainty in the definition of the contract being formed, in recognition of the fact that uncertainty creates economic risks for both parties which, if not addressed as provided in this Agreement, would affect the economic terms of this bargain. No custom, practice, course of conduct or course of dealing between the parties shall in any way modify, amend or supercede any express provision of this Agreement.

(ii)     This Agreement may be executed in multiple copies, each of which shall be deemed an original.

14.10. **Limitation of Claims.**   Except for claims arising from your non-payment or underpayment of amounts you owe us, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless a judicial or arbitration proceeding is commenced within two (2) years from the date on which the party asserting the claim knows or should have known of the facts giving rise to the claim(s).

15.   **NOTICE**

15.1.   **Notice.** All notices and statements to be given under this Agreement are to be in writing, delivered by hand, certified mail, return receipt requested, or by delivery by a reputable national service, such as Federal Express, to the following addresses (which may be changed by written notice). Notices of changes of addresses must be given at least ten (10) business days in advance of any notification contemplated under this provision or the prior address on file shall be deemed valid:

|          |                                            |
|----------|--------------------------------------------|
| YOU:     | As set forth at the beginning of this Agreement |
| COMPANY: | The Joint Franchise Co., LLC<br>2810 Paces Ferry Rd., Suite 108<br>Atlanta, Georgia 30339 |

16.   **REPRESENTATIONS AND ACKNOWLEDGMENTS**

NO SALESMAN, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE US TO THIS AGREEMENT EXCEPT THE MANAGING MEMBER OR IF NONE, ONE OF MEMBERS BY A WRITTEN DOCUMENT.   NO REPRESENTATIONS,

PROMISES, GUARANTIES OR WARRANTIES OF ANY KIND WERE MADE BY US OR OUR REPRESENTATIVES TO INDUCE THE EXECUTION OF, OR IN CONNECTION WITH, THIS AGREEMENT EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZE THAT IT INVOLVES BUSINESS RISKS MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON YOUR OWN BUSINESS ABILITIES, EFFORTS AND JUDGMENTS, AND THE SERVICES OF THOSE YOU EMPLOY, AND YOU EXPRESSLY DISCLAIM THE MAKING OF, AND YOU ACKNOWLEDGE THAT YOU HAVE NOT RECEIVED OR RELIED UPON, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.

YOU HAVE NO KNOWLEDGE OR ANY REPRESENTATIONS BY US OR ANY OF OUR MEMBERS OR REPRESENTATIVES ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT, THE UNIFORM FRANCHISE OFFERING CIRCULAR OR THE DOCUMENTS INCORPORATED IN THIS AGREEMENT.

YOU HAVE RECEIVED, READ AND UNDERSTOOD OR HAD THE OPPORTUNITY TO READ AND UNDERSTAND, THIS AGREEMENT, THE UNIFORM FRANCHISE OFFERING CIRCULAR AND THE EXHIBITS TO THIS AGREEMENT AND YOU HAVE HAD THE OPPORTUNITY TO MEET WITH US TO ASK QUESTIONS AND RECEIVE ANSWERS ABOUT THE FRANCHISE AND TO OBTAIN ADDITIONAL INFORMATION FOR VERIFICATION PURPOSES AND TO OBTAIN COUNSEL OF YOUR CHOOSING TO REVIEW THIS AGREEMENT AND DISCUSS YOUR LEGAL RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

YOU HAVE SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO BE CAPABLE OF EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN A BUSINESS SUCH AS *THE JOINT* BUSINESS OFFERED BY US AND YOU ARE MAKING AN INFORMED INVESTMENT DECISION WITH RESPECT THERETO.

YOU ARE AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF OURS MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT, AND CONSEQUENTLY THAT OUR OBLIGATIONS AND RIGHTS WITH RESPECT TO OUR VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES.

IN WITNESS WHEREOF the parties to this Agreement have executed, sealed and delivered this Agreement in duplicate counterparts on the day and year first above written.

21

**FRANCHISOR:**

The Joint Franchise Co., LLC, an Arizona limited liability company

By. _____ Fred Gerretzen _____

Name _____

Its _____ President

**YOU:**

_____ Daniel M. white PX 111 _____

By _____ Daniel/Minshew Q _____

Name _____

Its _____ First Int _____

EXHIBIT "A"

TO

THE JOINT FRANCHISE CO., LLC FRANCHISE AGREEMENT

LOCATION

_____

_____

_____

_____

_____

EXCLUSIVE TERRITORY, IF OTHER THAN 3 MILES.

Uniform Franchise Offering Circular – 7.2007

## EXHIBIT "B"

## TO

## THE JOINT FRANCHISE CO., LLC FRANCHISE AGREEMENT

### ELECTRONIC FUNDS TRANSFER (EFT) AUTHORIZATION

**Franchisee Information:**

Franchisee Name

                       Facility No.

Franchisee Mailing Address (street)

                       Franchisee Phone No.

Franchisee Mailing Address (city, state, zip)

Contact Name, Address and Phone number (if different than above)

Franchisee Fax No.

                       Franchisee E-mail Address

**Bank Account Information:**

Bank Name

                       Bank Account No.

Bank Mailing Address (street)

                       Bank Routing No.

                       (9 characters)

Bank Mailing Address (city, state, zip)         Bank Phone No.

**Payee Information:**      The Joint Franchise Co., LLC (for Royalty Payments)

**Authorization:**

    The Franchisee hereby authorizes the Bank to honor and charge the Bank Account for electronic funds transfers or drafts drawn on the Bank Account and payable to the Payees. The amount of such charge shall be set forth in a notice from the Payees presented to the Bank each month. The Franchisee agrees to execute such additional documents as may be reasonably requested by the Payees or the Bank to evidence the interest of this EFT Authorization. This authority shall remain in full force and effect until the Payees have received written notification from the Franchisee in such time and manner as to afford the Payees and the Bank to act on such notice. The Franchisee understands that the termination of this authorization does not relieve the Franchisee of its obligations to make payments to the Payees.

Signature:_____       Date:_____
Federal Tax ID Number:_____

### INDEMNIFICATION OF BANK

    In consideration of the Bank's compliance with the foregoing request and authorization, the Payees agree with respect to any action by the Bank in compliance with the foregoing request and authorization to indemnify the Bank and hold the Bank harmless for, from and against any loss the Bank may suffer as a consequence of the Bank's actions from or in connection with the execution and issuance of any electronic fund transfer or draft, whether or not genuine, purporting to be executed by the Payees and received by the Bank in the regular course of business for the purpose of payment, except to the extent such loss caused by the negligence or willful misconduct of the Bank.

### NOTE: FRANCHISEE MUST ATTACH A VOIDED CHECK RELATING TO THE BANK ACCOUNT.

Healthcare Practitioner License Printer Friendly Detail Information Di...       http://ww2.doh.state.fl.us/IRM00PRAES/prasindi_print_report.asp?Li...

# License Verification
Data As Of **7/25/2011**



## DANIEL MEIR WEBER
LICENSE NUMBER: **CH8526**

**Profession**
CHIROPRACTIC PHYSICIAN

**License/Activity Status**
CLEAR/ACTIVE

**License Expiration Date**
3/31/2012

**License Original Issue Date**
01/23/2003

**Discipline on File**
NO

**Public Complaint**
NO

**Address of Record**
3016 LAKE WASHINGTON RD
MELBOURNE, FL   32934
UNITED STATES

The information on this page is a secure, primary source for license
verification provided by The Florida Department of Health, Division of
Medical Quality Assurance. This website is maintained by Division staff and is
updated immediately upon a change to our licensing and enforcement
database.

## EXHIBIT "B"

### TO

## THE JOINT FRANCHISE CO., LLC FRANCHISE AGREEMENT

### ELECTRONIC FUNDS TRANSFER (EFT) AUTHORIZATION

**Franchisee Information:**

Franchisee Name

Facility No.

Franchise Mailing Address (street)

Franchisee Phone No.

Franchise Mailing Address (city, state, zip)

Contact Name, Address and Phone number (if different than above)

Franchisee Fax No.

Franchisee E-mail Address

**Bank Account Information:**

Bank Name

Bank Account No.

Bank Mailing Address (street)

Bank Routing No.

Bank Mailing Address (city, state, zip)

(9 characters)
Bank Phone No.

**Payee Information:**   The Joint Franchise Co., LLC (for Royalty Payments)

**Authorization:**

The Franchisee hereby authorizes the Bank to honor and charge the Bank Account for electronic funds transfers or drafts drawn on the Bank Account and payable to the Payees. The amount of such charge shall be set forth in a notice from the Payees presented to the Bank each month. The Franchisee agrees to execute such additional documents as may be reasonably requested by the Payees or the Bank to evidence the interest of this EFT Authorization. This authority shall remain in full force and effect until the Payees have received written notification from the Franchisee in such time and manner as to afford the Payees and the Bank to act on such notice. The Franchisee understands that the termination of this authorization does not relieve the Franchisee of its obligations to make payments to the Payees.

Signature: _____   Date: _____
Federal Tax ID Number: _____

### INDEMNIFICATION OF BANK

In consideration of the Bank's compliance with the foregoing request and authorization, the Payees agree with respect to any action by the Bank in compliance with the foregoing request and authorization to indemnify the Bank and hold the Bank harmless for, from and against any loss the Bank may suffer as a consequence of the Bank's actions from or in connection with the execution and issuance of any electronic fund transfer or draft, whether or not genuine, purporting to be executed by the Payees and received by the Bank in the regular course of business for the purpose of payment, except to the extent such loss caused by the negligence or willful misconduct of the Bank.

**NOTE: FRANCHISEE MUST ATTACH A VOIDED CHECK RELATING TO THE BANK ACCOUNT.**

Uniform Franchise Offering Circular – 7.2007